**UNITED STATES**

v.

**Airman First Class Chad A. RHINE,
United States Air Force.**

**ACM 37004.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 5 March 2007.

12 March 2009.

Appellate Counsel for the Appellant: Lieutenant Colonel Mark R. Strickland, Major

Shannon A. Bennett, and Captain Anthony D. Ortiz.

Appellate Counsel for the United States: Colonel Gerald R. Bruce, Major Jeremy S. Weber, and Captain Coretta E. Gray.

Before FRANCIS, HEIMANN, and THOMPSON, Appellate Military Judges.

## OPINION OF THE COURT

THOMPSON, Judge:

Consistent with the appellant's pleas, a military judge sitting as a general court-martial convicted him of one charge and one specification of failure to obey lawful orders, one charge and two specifications of willful damage to the non-military property of another, and one charge and one specification of stalking, in violation of Articles 92, 109, and 120a, UCMJ, 10 U.S.C. §§ 892, 909, 920a. The convening authority approved a sentence consisting of a bad-conduct discharge, confinement for 14 months, and reduction to E–1.[1] The appellant asserts three errors: (1) the military judge erred when he allowed, during sentencing, evidence of uncharged misconduct as facts and circumstances of the stalking charge and permitted trial counsel to argue those facts and circumstances as aggravating evidence; (2) the two specifications of wrongful damage to Airman (Amn) KRS's property are multiplicious with stalking; and (3) the appellant's sentence is inappropriately severe.[2] Though not raised by the appellant, the Court also examined whether he is entitled to relief because of appellate processing delays. Finding no error, we affirm.

### Background

The appellant was a voice management systems airman assigned to the communications squadron at Royal Air Force Mildenhall, United Kingdom. The appellant and Amn KRS developed a friendship and then a sexual relationship that lasted from the end of May 2006 until the middle of June 2006. Amn KRS was married at the time, and her husband did not arrive in country until the middle of June 2006, at which time Amn KRS told the appellant that they needed to end their relationship.[3] Initially, Amn KRS thereafter attempted to maintain a platonic friendship with the appellant, but by August 2006 Amn KRS told the appellant they must end their friendship completely. Following an incident at a movie theater on 25 August 2006, the appellant was issued the first of two no-contact orders. Despite this no-contact order, on 2 September 2006, at approximately 0300 hours, the appellant drove to Amn KRS' on-base house, scratched the word "slut" into the hood of one of her cars, and slashed one of the car's tires. Amn KRS reported the damage. Although unable to prove who committed the damage, the appellant's first sergeant suspected the appellant. Therefore, on 7 September 2006, he issued a second no-contact order, which included an order to have no contact with the base housing area where Amn KRS lived and no contact with Amn KRS' husband. On 1 October 2006, at about 0430 hours, the appellant drove to Amn KRS' housing area, climbed the fence, and proceeded to Amn KRS' home. Once there, he scratched the hood of her second car with the words "Chad 'heart' U"[4] and slashed one of its tires. The next morning, Amn KRS discovered the damage and filed a report. In the early morning hours of 2 October 2006, the appellant once again traveled to Amn KRS' housing area, climbed the fence, and walked to her home. This time, he used his Leatherman Multitool to bang on her window twice, then departed the area. Amn KRS heard the banging but did not see anyone outside her home so she went back to sleep. That morning, as Amn KRS was reporting the damage to her second car to her first sergeant, she received a text message from the appellant which read: "Im sorry 4 slashing ur tires, im sorry 4 keying

---

1. The military judge sentenced the appellant to a bad-conduct discharge, confinement for 15 months, and reduction to E–1.

2. Error 3 is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982).

3. The record of trial contains references to non-judicial punishment received by Amn KRS for this inappropriate relationship.

4. The appellant scratched a picture of a heart into the hood of Amn KRS' car, not the word "heart."

ur cars, im sorry 4 deleting ur yahoo, im sorry 4 telling ur husband our secret, im sorry 4 stealing ur cd, I know theres no way u would 4give me, so this is my goodbye. [sic]" Shortly thereafter, Amn KRS received a second text message which read: "Im just a failure I could'nt break your window this morning and now i cant kill myself either. [sic]" Amn KRS showed both messages to the first sergeant, who immediately located the appellant. The appellant was admitted to a local treatment facility. After his release, he was placed in pretrial confinement, which continued until his court-martial.

### Sentencing Evidence

At trial and again on appeal, the appellant asserts that the military judge erred in allowing trial counsel to elicit evidence of uncharged misconduct during sentencing. The appellant requests that this Court set aside the sentence and order a new sentencing hearing. Finding no error, we grant no relief.

The trial counsel called Amn KRS to testify during sentencing. Amn KRS testified about numerous encounters with the appellant which were either outside the charged timeframe or were not charged. We will examine each encounter. First, Amn KRS testified that after her husband, RH, arrived in England, and after she told the appellant that they would just be friends, the appellant continued to touch her in a sexual way and do sexual things in front of her husband. Her testimony proceeded as follows:

AMN KRS: I told [the appellant] that I strictly wanted to be friends, that our sexual relationship was hindering my relationship with my husband.

TC: What happened after you told him you just wanted to be friends?

AMN KRS: He said that was no problem, but he was still continuing to touch me in front of my husband and do sexual things in front of my husband.

TC: When you say "sexual things" what are you referring to?

AMN KRS: Like an example would be when we were in the car, [RH] would be driving and I would be in the passenger seat, [the appellant] would be in the back and he would show me his penis. Sexual things like that and touching me in front of my husband.

CDC: Your Honor, I'm going to object to all of this. This is uncharged misconduct inappropriate under [Rule for Courts–Martial] R.C.M. 1001.

MJ: Let me ask a question in weighing your objection. Your husband is [RH]?

AMN KRS: Yes, sir.

MJ: He's not in the Air Force?

AMN KRS: No, sir,

MJ: Just to be clear, he arrived here at some point in July or June?

AMN KRS: At the end of June.

MJ: And there were occasions on which you, your husband and [the appellant] would all go out together?

AMN KRS: Yes.

MJ: And your husband, I take it was unaware that there was a relationship between the two of you?

AMN KRS: Yes, Your Honor.

MJ: Your purpose in eliciting these things is for what?

TC: Facts and circumstances and the effect it had on the victim. We're not alleging that this misconduct per se is at issue; it's not. It goes to the state of mind of the victim, her fear based on the events that we did allege.

MJ: Okay, it's admitted only for that purpose, that is, to touch upon or build a case for the later stalking that this is how it progressed prior to the charged time period. It's not to be considered by the court for any other purpose. Do you object to that?

CDC: Well, I mean they can just ask the question about fear. I don't understand why we need to talk about stuff that is uncharged.

MJ: I assure you the court won't consider that for the truth of the matter asserted.

CDC: Yes, Your honor.

MJ: I believe it's appropriate to develop a predecessor, not a time for whatever stalking that may be here, but I share your concern. Are we going to have other kind of testimony like that?

TC: Your Honor, it's a series of events. I mean a series of events that led to this and it's all offered for her state of mind. Getting up here and asking her if she was afraid in and of itself is not to flesh out the facts and circumstances of the stalking charge.

MJ: I'm going to overrule your objection. I appreciate this. I think it would be a harder call, if I was doing it with a panel to be honest in terms of 403, but I would like to hear it and at the end I may allow you to re-engage. But I would like to hear all of it and put it in perspective.

Amn KRS next testified of an encounter she had with the appellant in his dorm room in early July 2006. The appellant told Amn KRS that if he could not have a sexual relationship with her "he did not want to even be alive." Amn KRS became concerned about his mental state and asked her husband to drive with her over to his dorm room. Her testimony proceeded as follows:

TC: What happened when you got there?

AMN KRS: When I got there [the appellant] was sitting on the side of his bed with his hands out and his knuckles were red and swollen and there were marks on the walls from I guess where he would be hitting it.

TC: Then what happened?

AMN KRS: We sat down and we were just talking. I'm not trying to console him—

MJ: Just to be clear, this is July and you're in his dorm room?

AMN KRS: Yes, sir.

MJ: Okay. Your husband is not there?

AMN KRS: My husband is outside because I knew I didn't want [RH] too upset. Like if [the appellant] were to see [RH], it would make him more upset than he was at the time.

. . . .

AMN KRS: I asked him if he was okay. . . . I finally told him, "Yeah, Rodney is outside." And he made threatening remarks that "Yeah I could go and beat him up or I can kill him." And I said, "you couldn't do shit." He pushed me up against the wall and said "Yes, I can."

Then I told him never to touch me like that again. Then I left and went home.

The trial defense counsel did not object.

Amn KRS also testified that around the beginning of August 2006, she sent the appellant a text message, saying she did not want to be friends with him anymore and that she did not want to see him or talk to him "ever again." Amn KRS then described an incident involving the appellant after she and her husband attended a movie. The relevant testimony is as follows:

TC: Did there come a time that you came in contact with the accused at the movie theater?

AMN KRS: Yes, I believe it was sometime that weekend after I told him I did not want to be friends. I walked out of the movie, after I saw the movie, looked over at my phone and it said, "How's the movie?" I was wondering, why [sic] would that say that? I walked outside and [the appellant] was propped up against the movie poster. . . . We walked across the street and he said, "If you don't want to lie to your husband tell him the big truth." I begged and pleaded with him not to say anything; that we can continue to be friends, that we will work this out just between us. He turned to my husband and said, "I fucked your wife."

. . . .

AMN KRS: I ran away to the car crying. My husband asked him what the hell his problem was. [The appellant] got into his car. My husband came over to me and asked me if it was true. I said, "Yes." Then, [the appellant] got in his car and drove around the other side of the parking lot and my husband stood outside and put his hands out like this—

TC: The witness is putting both hands out to the side with her palms up.

AMN KRS: [The appellant] came to an almost a stop and [RH] put one foot outside of the sidewalk, and [the appellant] sped up and moved his car towards my husband. My husband jumped back and [the appellant] zoomed off.

CDC: Objection, again, Your Honor, aggravating circumstances 1001.

MJ: I hear it loud and clear. I'm going to hear all this testimony.

CDC: I understand, Your Honor, I just didn't want to waive any objection as we've been through all this.

MJ: ... I understand completely.

Amn KRS went on to describe how this incident led to the first of two no-contact orders, as well as the damage to her vehicle, the second no-contact order, the damage to her second vehicle, and the appellant's use of his Leatherman Multitool to bang on her window. In addition, Amn KRS testified that she arrived at work one day to find that her work computer user account had been modified to prevent her from logging onto the computer. She learned the appellant was responsible. In fact, trial counsel introduced a letter of reprimand issued to the appellant for abusing his computer administrator duties on 1 September 2006 by altering the accounts of 19 people, including Amn KRS. Amn KRS next described how the appellant contacted her sister through her account on the My Space website,[5] and told her sister of their relationship. She also testified that towards the end of September 2006 she attempted to log in to her personal Yahoo[6] account and discovered the user password had been changed. The appellant admitted most of this misconduct in his final text messages to Amn KRS.

After the government rested, the military judge had the following exchange with the counsel:

MJ: Can I just say one thing? ... Your motion, trial counsel, it's clear that you offered—there were a lot of facts beyond that which is charged; do you agree?

TC: Yes, Your Honor.

MJ: And you're offering them only for the limited purpose of showing how they might later have produced the fear required by the element in stalking?

TC: Yes, Your Honor.

MJ: Does that alleviate your concerns?

CDC: Yes, Your Honor. I just wanted to make sure that he wasn't punished or sentenced for any of that stuff, only for what he was charged with and pled guilty to.

MJ: Please be careful in argument not to allude to him in that capacity ... when you come to sentencing argument, because those facts are only for that purpose of establishing the later fear.

TC: Yes, Your Honor.

*Discussion—Sentencing Evidence*

In discussing the appellant's uncharged misconduct, the military judge did at one point appear to rule the evidence was admissible to show "the fear *required by the element in stalking.*" (Emphasis added). However, this was a guilty plea case, and Amn KRS' fear, insofar as it was an element of the stalking charge, had already been conceded by the appellant. Therefore, the evidence of uncharged misconduct was not admissible to prove fear *as an element in stalking.* *United States v. Wingart,* 27 M.J. 128, 135 (C.M.A.1988). Although that one statement by the military judge might imply the evidence was offered for that improper purpose, it is clear from the entire discussion that the government was offering the uncharged misconduct as direct evidence in aggravation. Therefore, the proper analysis of the asserted error is under R.C.M. 1001(b)(4), which states:

> The trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to any person or entity who was the victim of an offense committed by the accused and evidence of significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense.

As our superior court has explained,

> There are two primary limitations on the admission of aggravation evidence. First, such evidence must be 'directly relating' to

---

5. http://www.myspace.com.

6. http://www.yahoo.com.

the offenses of which the accused has been found guilty ... [and second the evidence] must also pass the test of Military Rule of Evidence (M.R.E.) 403, which requires balancing between the probative value of any evidence against its likely prejudicial impact.

*United States v. Hardison,* 64 M.J. 279, 281 (C.A.A.F.2007); *see also Wingart,* 27 M.J. at 135 (evidence is directly related to the offense if it is preparatory to, accompanies, or follows that offense). Further, these limitations do "not authorize introduction in general of evidence of ... uncharged misconduct," *United States v. Nourse,* 55 M.J. 229, 231 (C.A.A.F.2001) (quoting Drafters Analysis, *Manual for Courts Martial, United States (MCM),* A21–67 (1995 ed.)), and is a " 'higher standard' than 'mere relevance.' " *United States v. Rust,* 41 M.J. 472, 478 (C.A.A.F. 1995) (quoting *United States v. Gordon,* 31 M.J. 30, 36 (C.M.A.1990)).

 We review a military judge's decision on admission of sentencing evidence for an abuse of discretion. *United States v. Barnett,* 63 M.J. 388, 394 (C.A.A.F.2006) (citing *United States v. McDonald,* 59 M.J. 426, 430 (C.A.A.F.2004)); *United States v. Gogas,* 58 M.J. 96, 99 (C.A.A.F.2003). "[A] military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Barnett,* 63 M.J. at 394 (quoting *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F.1995)). If evidence was improperly admitted we must also determine whether or not the appellant was "substantially prejudiced" by the erroneous admission of this evidence. *United States v. Boles,* 11 M.J. 195, 199 (C.M.A.1981).

The appellant's case was before military judge alone. Our superior court has consistently noted that these "experienced and professional military lawyers who find themselves appointed as trial judges" are assumed to be able to appropriately consider only relevant material in assessing sentencing. *Hardison,* 64 M.J. at 283–84 (quotations omitted); *see also United States v. Erickson,* 65 M.J. 221, 225 (C.A.A.F.2007) (military

judge sitting alone is able to distinguish between proper and improper sentencing arguments); *United States v. Bungert,* 62 M.J. 346, 348 (C.A.A.F.2006) (holding that "particularly in light of the fact that the sentencing was by a military judge sitting alone," the appellant failed to show how impermissible evidence had prejudiced him).

 In the case at hand, we find the military judge properly admitted the sentencing evidence. When dealing with a charge of stalking and the consequent fear of the stalking victim, we will broadly construe the first element of the *Hardison* test regarding whether the evidence is directly related. We conclude that all the facts, circumstances, and activities between the victim and the appellant are directly related to the charged offense of stalking, and therefore, are admissible in aggravation during sentencing under R.C.M. 1001(b)(4). · Additionally, the evidence demonstrates a continuing course of conduct by the appellant involving similar actions and misconduct with the same victim. *Nourse,* 55 M.J. at 231–32. Furthermore, we find the evidence to be closely related, if not directly tied, in time with the charged offenses. *See Hardison,* 64 M.J. at 281–82 ("uncharged misconduct and [a] crime ... must be ... closely related in time, type, and/or often outcome"). On the balancing portion of the *Hardison* test, we find the probative value of this evidence far outweighs the possible prejudicial impact.[7] The evidence was probative of the fear experienced by Amn KRS. Fear is a critical element of the offense of stalking. The military judge was quite clear that in this, a judge alone case, he was considering the evidence solely for the issues related to fear and the offense of stalking. We hold the military judge did not abuse his discretion.

*Sentencing Argument*

During sentencing, the trial defense counsel made no objection to the trial counsel's argument. Now, on appeal, the appellant asserts that the military judge erred when he allowed the trial counsel to base a portion of

7. Although the military judge did not clearly articulate a Mil. R. Evid. 403 balancing test, he did make reference to that rule in stating he would allow the testimony, but he may have had a different outcome had the case been before members.

her argument on sentencing evidence which he claims is uncharged misconduct.[8] The relevant portion of the trial counsel's argument is as follows:

> TC: Your Honor, this series of events started in June 2006 when the victim broke off the sexual relationship she had with the accused. The victim was willing to remain friends, but that was not enough. The accused scared the victim, frightened the victim when he did things like touch her in front of her husband, made her feel uncomfortable, continually—
>
> MJ: Remember now, that is not charged.
>
> TC: Your Honor, "scared the victim when he," it's just the way I'm phrasing it.
>
> MJ: Go ahead.
>
> TC: He exposed his penis to her in the presence of her husband while they were in a vehicle—
>
> MJ: Remember—
>
> TC: —he scared her when he lured her to his dorm room threatening suicide.
>
> MJ: I just need to make this clear. He is not being sentenced for that conduct, if that occurred.
>
> TC: No, Your Honor. The government is offering that purely to go to the victim's state of mind and her fear.
>
> MJ: Very well. I will not—
>
> TC: In regards to the stalking charge.
>
> MJ: We have a common operating picture. I won't inject gain. Go ahead.

The appellant asserts the uncharged misconduct was improperly admitted and was the centerpiece of the trial counsel's sentencing argument, and therefore the military judge erred.

### Discussion—Sentencing Argument

"When a defense attorney fails to object to a sentencing argument at the time of trial, appellate courts review the statement for plain error." *Erickson*, 65 M.J. at 223 (citations omitted). To prevail under the plain error standard, the appellant must establish that "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F.2000) (citing *United States v. Finster*, 51 M.J. 185, 187 (C.A.A.F.1999)).

■ We find there is no error, let alone plain error, in the trial counsel's sentencing argument. First, as discussed above, the evidence was proper evidence in aggravation. Second, in this case, although it was not necessary to do so, the military judge made it clear on the record that he was considering the evidence for the limited purposes of showing the victim's fear in relation to the offense of stalking. *Cf. Erickson*, 65 M.J. at 225, n. 2 (appellate court may presume the military judge did not consider improper argument in the absence of evidence to the contrary). Here, the record is clear. Thus, we find the appellant has failed to establish there was plain error.

### Multiplicity

■ The appellant asserts, for the first time on appeal, that the two specifications of wrongfully damaging Amn KRS's property are multiplicious with stalking, arguing the damage of property specifications are "lesser charges" to the stalking offense because they arise from the same fact scenario.[9]

Offenses are multiplicious if one is a lesser-included offense of the other, *United States v. Palagar*, 56 M.J. 294, 296 (C.A.A.F.2002) (citations omitted), or if the offenses are "facially duplicative," i.e., factually the same. *United States v. Heryford*, 52 M.J. 265, 266 (C.A.A.F.2000) (quotations omitted). Ordinarily, an unconditional guilty plea waives a multiplicity issue, unless it rises to the level

---

**8.** The military judge did *sua sponte* interrupt trial counsel several times during her argument to address the issue of sentencing aggravation evidence.

**9.** During the trial, the military judge put on the record matters which were addressed during a pretrial session pursuant to Rule for Courts–Martial 802. He stated "the court raised the issue of whether there was any multiplicity with regard to the Specification of Charge II (stalking) and the two Specifications of Charge III (damage to personal property)." With the exception of that reference to multiplicity, there is nothing else contained in the record of trial which indicates what was discussed and there is no ruling by the military judge on the record. The trial defense counsel did not raise the issue.

of plain error. The appellant bears the burden of showing that such an error occurred. *United States v. Powell,* 49 M.J. 460, 464–65 (C.A.A.F.1998).

Our superior court recently summarized the rules and standards for assessing multiplicity claims where the appellant first raises the issue on appeal as follows:

> [The a]ppellant may show plain error and overcome [waiver] by showing that the specifications are *facially duplicative*, that is, factually the same. The test to determine whether an offense is factually the same as another offense, and therefore lesser-included to that offense, is the elements test. Under this test, the court considers whether each provision requires proof of a fact which the other does not. Rather than adopting a literal application of the elements test, this Court [has] stated that resolution of lesser-included claims can only be resolved by lining up elements realistically and determining whether each element of the supposed lesser offense is rationally derivative of one or more elements of the other offense—and vice versa. Whether an offense is a lesser-included offense is a matter of law that this Court will consider de novo.
>
> To determine whether the offenses are factually the same, we review the factual conduct alleged in each specification, as well as the providence inquiry conducted by the military judge at trial.

*United States v. Hudson,* 59 M.J. 357, 359 (C.A.A.F.2004) (internal quotations and citations omitted) (emphasis added).

■ The appellant pled guilty to stalking the appellant by slashing the tires of two cars, carving the word "slut" on the hood of one car and "Chad 'heart' U" on another car, and repeatedly sending text messages to Amn KRS. During the *Care*[10] inquiry for stalking, the military judge and the appellant engaged in a lengthy discussion of the elements of stalking and how the appellant's actions met each element.[11] Review of the *Care* inquiry makes it quite clear that the majority of the discussion regarding the stalking charge focused on the "fear of death or bodily harm" aspect of the offense.[12] In fact, in response to a request by the trial counsel for additional inquiry, the military judge restated the elements and asked the appellant to tell him why he was guilty of the elements. The appellant stated

> Based on these elements I understand she could be fearful of bodily harm and her life and sexual assault based on the actions that I did; going to her house, damaging her vehicles right in-front of her house, knowing that she could be dead. She wakes up the next morning seeing someone was right in front of her house damaging her cars, people would think, she would think that she would be fearful of her life. And according to the police reports she was in induced fear based on every action I did because she did go to Family Advocacy and filed police reports after every action.

The *Care* inquiry regarding the damage to Amn KRS' vehicles focused on the actual damage, ownership of the vehicles, and how the appellant caused the damage.[13,14] Unlike

**10.** *United States v. Care,* 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969).

**11.** The military judge, consistent with the elements listed in 10 U.S.C. § 920a (2006), advised the appellant of the elements of stalking as follows:

> MJ: One, that on or about 25 August 2006 to on or about 27 October 2006, at or near Royal Air Force Mildenhall and Royal Air Force Lakenheath, United Kingdom, you wrongfully engaged in a course of conduct directed at [Amn KRS], by, to wit: slashing her tires and carving in the hoods of two of her vehicles and repeatedly sending her text messages that would cause a reasonable person to fear death or bodily harm, including sexual assault, to herself;

> Two, that you had knowledge, or should have had knowledge, that [Amn KRS] would be placed in reasonable fear of death or bodily harm, including sexual assault, to herself; and Three, that your acts induced reasonable fear in [Amn KRS] of death or bodily harm, including sexual assault, to herself.

**12.** The *Care* inquiry on the charge and specification for stalking continued for twenty-four pages.

**13.** The military judge, consistent with the provisions in the *Manual for Courts–Martial, United States (MCM)* (2005 ed.), advised the appellant of the elements of damaging personal property in Specification 1 of Charge III, as follows::

> MJ: One, that between on or about 1 September 2006 and on or about 15 October 2006, at

the discussion regarding the stalking, there was no discussion of the fear this would cause to Amn KRS.

Pursuant to *Hudson*, we conduct our review to determine whether the offenses are factually the same, looking at the factual conduct alleged in each specification as well as the providency inquiry conducted by the military judge. We find it is clear that the appellant's offenses of stalking and of damaging Amn KRS' vehicles are factually distinguishable. The required elements for stalking and for damage to personal property are not identical; in fact, they require completely different items of proof. Additionally, upon review of the *Care* inquiry, we find clear differences in the focus of the military judge. On the one hand, with the stalking charge, the military judge and the appellant focused primarily on the fear. On the other hand, with the damage to personal property charges, the military judge and the appellant focused primarily on the specifics of the damage, with no inquiry or discussion on the aspect of fear. Therefore, we find the charge and specification for stalking is not facially duplicative with the charge and specifications of damage to Amn KRS' vehicles. The appellant has not met his burden of establishing plain error.

### Sentence Appropriateness

■ The next issue is whether the approved sentence of 14 months confinement, reduction to E–1, and a bad-conduct discharge is inappropriately severe.

---

or near Royal Air Force Lakenheath, United Kingdom, you willfully and wrongfully damaged certain personal property, that is a 1995 blue Rover Sterling vehicle by carving the word "Slut" into the hood and by slashing a tire;
Two, that you specifically intended to damage the 1995 blue Rover Sterling vehicle; and
Three, that the property damaged was the property of [Amn KRS]; and
Four, that the damage was in the amount of $500.00 or less.
*MCM*, Part IV, ¶ 33.b.(2) (2005 ed.). The *Care* inquiry for this specification was 11 pages long in the record of trial.

14. The military judge advised the appellant of the elements of damaging personal property in Specification 2 of Charge III, as follows:

We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A.1988); *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982).

After careful review of the record of trial, all the facts and circumstances surrounding the offenses of which the appellant was found guilty, and the appellant's post-trial submissions, we conclude the appellant's sentence is not inappropriately severe. The appellant was convicted of stalking a fellow airman, damaging her two personal vehicles by scratching the hood and slashing the tires, and disobeying no-contact orders. The appellant's misconduct was egregious. Therefore, we do not find the appellant's sentence inappropriately severe.

### Moreno

In this case, the overall delay of 663 days between the time the case was docketed at the Air Force Court of Criminal Appeals and completion of review by this Court is facially unreasonable. Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972):(1) the length of the delay; (2) the reasons for

---

MJ: One, that between on or about 1 September 2006 and on or about 15 October 2006, at or near Royal Air Force Lakenheath, United Kingdom, you willfully and wrongfully damaged certain personal property, that is a 2007 Silver Mustang Coupe vehicle, by carving the words "Chad heart U" into the hood and by slashing a tire;
Two, that you specifically intended to damage the 2007 Silver Mustang Coupe vehicle;
Three, that the property damaged was the property of [Amn KRS and RH]; and
Four, that the damage was in the amount of more than $500.00.
*MCM*, Part IV, ¶ 33.b.(2) (2005 ed.). The *Care* inquiry for this specification was 10 pages long in the record of trial.

the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *United States v. Moreno*, 63 M.J. 129, 135–36 (C.A.A.F.2006). When we assume error, but are able to directly conclude that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F. 2006). This approach is appropriate in the appellant's case.

Having considered the totality of the circumstances and the entire record, we conclude that any denial of the appellant's right to speedy post-trial review and appeal was harmless beyond a reasonable doubt and that no relief is warranted.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the approved findings and sentence are

AFFIRMED.